Good morning, Your Honor. I'm Paul Eaglin representing Wade McCullough. Thank you for hearing his case. I'm from Fairbanks. And Mr. McCullough lost his Social Security Disability claim at what is referred to as Step 2 of the five-step sequential evaluation process. That is the step at which, after determining whether the person is or is not working, an administrative law judge makes a severity assessment, a threshold severity assessment with respect to the impairments that are of record. The judge here said he had no severe impairments that were, in effect, cognizable for purposes of a disability claim. We disagree with that. We believe that the record establishes abundant evidence from treating physicians as well as the Social Security Administration's own retained physicians who examined him that he has significant impairments, a number of them. What we see in the record and the decision is that the judge decided to track his severity assessment with that of two doctors who did not meet Mr. McCullough, did not examine him. They reviewed only the record that they had before them at the time. But we see from the record, if we look at the dates, however, that Dr. Cain, who did the orthopedic or the physical exam, I believe he's an orthopedist, and Dr. Winn, who does a lot of the psychiatric assessments around here on record examinations, record reviews, assessed non-severe. Judge Adams's decision tracked that, claiming that Mr. McCullough had no severe impairments that were recognizable for purposes of a disability claim. We disagree with that because the treating physician, Dr. Andreesen, consultative examiners, Dr. Carroll, Dr. Hunley, found a number of severe impairments that are well... Well, what are they? He has emphysema. He has a number of years of smoking since childhood. He has significant mental impairments, a significant mental impairment, personality disorder. He gets into fights. Well, that seems, you know, I read this record and he seems like a very difficult person. He is. But I don't know what that means he's disabled. The type of, that type of difficulty, as you said, Your Honor, the difficult person referred to in a number of disability claims as somebody with a personality disorder is in fact found to be disabled based on those types of personality disorders. This inability to get along with others, the inability to take instruction and guidance from somebody in a supervisory position. He loses job after job after job because he gets in a fight with his boss. Is that, let's assume for sake of argument, it seems clear that he has an antisocial, he's an antisocial characteristic. So he gets in fights and he loses his temper. Is that enough to say that he's disabled and the government should not pay him so that he won't go get into fights on the job site? Not, that's not why he would be paid. It's because of the determination that he meets or equals a listing level impairment either by itself or in combination. I overstated the point, but I think you see my point. Usually the ones we have come in here is because they can't do the job. Right. Here he's got antisocial characteristics, which we find very often in other areas that we review. Sure. And is that sufficient? And I think it's your position is that this is something he is unable to overcome and therefore he is not qualified to work. That's correct, Your Honor. And we have diagnoses from qualified physicians who are either treating physicians or consultative examiners with appropriate specialties who diagnose mental impairments of significance. Okay. Then getting back to the doctors, on Dr. Andresen, the treating doctor, the ALJ took the position there that there was no positive test, no objective findings, and therefore he was going to reject the treating physician. Then you have the other physicians and they're sort of mixed. Can the ALJ then choose what sounds right to him as far as the medical diagnosis is concerned under those facts? I believe that, Your Honor, I would say no, because where an administrative law judge is trying to, in effect, make a diagnosis based on what he reads from other — from doctor's reports, he's playing doctor rather than administrative law judge. He certainly has fact-finding ability. That's — obviously, that's his role. But where you have, as you pointed out with some of the CEs, the consultative examiners, a bit of a mix there, and then you have a stronger statement from Dr. Andresen, and one of the consultative examiners also opined, as did Dr. Andresen, that these mental impairments, this kind of antisocial behavior — Let me make my — let's assume that he's right, that he can reject Andresen because he doesn't make objective findings. Let's say we could sustain him on that. How would we — how would you argue that his choice of who he would believe were the other physicians needs to be reversed? Okay. And you said in setting that up that we would assume that he could — I want to assume that point so I can see what he's actually dealt with. He rejected Andresen. Okay. And then he decided how he would be based upon mixed doctor's reports. All right. There, it can be more difficult where the medical evidence might be determined to be somewhat inequipoise, and then you have a judge — an administrative law judge in a position to make a finding that, if you determine to be reasonable, would be sustained. On the other hand, if the record as — taken as a whole does not support that, then, of course, we would argue that the correct decision would be to reverse that. And that is, in fact, what we're saying because we think that the weight of the evidence taken as a whole, treating physicians, consultative examiners, establishes that Mr. McCulloch has severe impairments, that he met the threshold severity requirement at Step 2 of the sequential evaluation process. The — I'm sorry. Go ahead. So your point is that he can't stop at Step 2. He's got to keep going. We felt that he erred at Step 2 and should have continued on. And, in fact, as you see from the brief, I even argued that at Step 3, that Mr. McCulloch satisfied Step 3 and that the Court should consider reversal with direction to pay benefits based on a disabled as a matter of law. But for purposes of argument, I'm trying to argue the point that that was the basis for the decision. And that's how he lost at Step 2. Judge Paez, I believe you had a question. No, I was going to — the ALJ, in his decision, said — I guess it's — well, I just have the decision. I'm not sure if it's a decision or the administrative record, but — Okay. At one point, he says the claimant's symptoms appear to be exaggerated, which is also thought. It looked like what he's saying there and what the doctors were saying is that his inability to work was caused by his, you know, somatic. It was all — it's all really in his head. That can be — the somatization disorder is, in fact, one of the categories in the listings. In fact, I've even had clients found disabled based on that. Right. That's right. And so that, to me, is another reason to question and to really wonder in my mind, how could he then say that he has, at Step 2, that he has no severe impairments? This is — this finding, it seems to me, undermines that. This kind of discussion by the ALJ undermines his conclusion that Mr. McCulloch failed at Step 2. This points towards satisfying the threshold severity requirement, I would argue. Okay. Can I ask you a little bit more about the — what you call the severe medical impairments? You were saying something on somatic. Is that correct? Somatization disorder is one of the categories. I'm sorry. You've got to stop. Say it a little more slowly. All right. The somatization disorder is one of the — What is that? This, as we see here, somewhat of the exaggeration of physical symptoms magnifying their — You mean if somebody comes in before an ALJ and exaggerates them, that's going to be a count as a kind of medical disability? No, I'm not saying that, Your Honor. I'm saying that, in fact, I have been before administrative law judges who have found claimants disabled for somatization disorder based on well-documented instances in which the person would go to doctor after doctor or the same doctor with complaints that were not justified or were magnified. That itself can be, when properly diagnosed, determined to be either meeting or equaling a listing or taken in combination with other elements, might point towards disability. But no, they're not — they're not giving out money to people who are faking illnesses, Your Honor, if that's what you're getting at. Well, what are the other severe medical impairments that you have in mind? Sorry? You said there were severe medical impairments. What are they? Oh, the — he has emphysema from child — Emphysema is not a medical impairment, is it? Yes, sir. Emphysema is — Yes, sir. Yes, briefly. I'm sorry. I thought you said mental impairments. He has mental impairments as well. The personality disorder, those are — Well, is that the same as what you already talked about or something else? He complained of other physical injuries or — No, I want to focus on the severe mental impairments. That's the personality disorder that we've been discussing, Your Honor. And that's the tendency to exaggerate. That's part of it. Yes. Yes, sir. That is part of the mental disorder. It manifests itself in the magnification of the — of his injuries and his symptoms, this inability to get along with others, the fighting, the inability to just control his behavior, his conduct, in a way that would permit him — Well, he — when he went to his doctor — I mean, if you go through, I think, which doctor it was, you know, he lists, I don't know how many complaints. Right. There must have been 20 or so. Which, you know, over a period of time, they really — some they identify, some they can't explain. And that leads them to conclude that, you know, it's all — you know, it's a somatization disorder. That is, it's in his head. And it's not that he's lingering. It's that he can't work because of his — this somatization function or dysfunction, I guess it is. That's what I understand. Which is a separate category. Right. As I understand. I'm not well-informed about somatization. And it's hard to — you know, it's intuitively — doesn't fit here nicely because they use the term, as the ALJ did here, tends to exaggerate his condition. Right. Which suggests that he really just doesn't want to work and lingering. But it's really not lingering. It's something different entirely. That's right. It's a difficult diagnosis. It's rare. I don't see it that often. Well, you know, it's not absolutely clear that there's a somatization disorder diagnosis here. But the record seems to suggest that. And that's what the ALJ kind of thought. I mean, he says, you know, use it. But I think he uses it incorrectly. I agree in that — I mean, I would say that that, apart from everything else, that alone met the threshold severity requirement. At least to go on and explore further. Yes, sir. The first hearing officer did, as a matter of interest. Or maybe I'm confusing — The first hearing — No, this isn't the one. Never mind. This is the only one. There was only one here, Your Honor. I could — there's so many cases. Yeah. I'm getting them confused. I'd like to — may I reserve my time? Yes, you can have a minute. Good morning. May it please the Court. I'm Nancy Michelini here for the Commissioner. Mr. McCullough does not have any severe impairments. He doesn't have any mental severe impairments. An impairment is only severe if it has a significant — if it creates a significant limitation on your ability to work. Why is Mr. McCullough not working? He says he became unable to work on March 4th of 2000. And what happened that day? That day, he was fired from his job, and his tools were stolen, and he was hauled off to jail for getting into an altercation with his manager. After that, he came back, and he found out that his tools had been stolen. Later, he says that $70,000 to $80,000 worth of uninsured tools were stolen from him. That's in the record at 314, at 353, and at 376. So he just gave up. He's been an auto mechanic all his life. He worked with his dad on cars from childhood. That's in the record. So we know that that's what he did. And when his tools were stolen, he just decided he wasn't going to work anymore. Now, we know this from what he told Dr. Carroll, that he worked as an auto mechanic until his third tool theft left him unable to work. And that's in the record at 151. Also, in March 2000, he told the caregiver that he was angry about his tools being stolen. That's when he went to get some treatment at that time because he was feeling suicidal after spending four days in jail and getting out and getting fired and then finding out that his tools had been stolen. But at that point, he told the caregiver that he was angry about $6,000 worth of tools that had been stolen. He was given Paxil and Ativan, and then he sought no further treatment after that. The next medical records that we see in the record are a year later. In May of 2001, Dr. Hanley performed a consultative physical examination. Dr. Hanley said that Mr. McCullough's complaints, he had multiple systems spanning numerous organ systems. Dr. Hanley said he took only Levsin for stomach cramps. So he no longer took any of the Paxil or the Ativan, but just the Levsin for stomach. His physical exam yielded normal results. Dr. Hanley found no objective evidence to support any physical complaints. Dr. Hanley concluded that he could sit, stand, move about, lift, carry, handle objects, speak, see, and travel. Dr. Hanley suggested the possibility of an underlying psychiatric disorder since he found nothing physically wrong with him. He made no psychiatric diagnosis, however. In fact, in the psychiatric exam, he found normal thought processing, normal understanding, judgment, memory, and effect, all normal. And that's in the record at 157. And we know that there was no significant mental impairment because less than two weeks before Dr. Hanley's evaluation, Dr. Carroll performed a consultative psychiatric evaluation. Dr. Carroll concluded that Mr. McCullough had an antisocial personality disorder and a dysthymic disorder with a global assessment of functioning, that's a GAF, at 70. Now, a GAF between 61 and 70, and that's a range, and Mr. McCullough is at the very top of this range, indicates some mild symptoms or some difficulty in social occupational school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships. And Dr. Carroll commented that it appears while that he has felt his irritability and physical pains have left him unable to work for over a year, they're not bad enough that he sought any treatment for them. So there was no medical records at all. He sought no treatment for a year. So based on the medical evidence in the record, the ALJ used the special technique, as he is required to do, to find no restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild deficiencies of concentration, persistence, or case, and no episodes of decompensations. And we know from the regulations at 20 CFR 404-1520, lowercase a-d-1, the regulations state that if we rate the degree of your limitation in the first three functional areas as none or mild, and none in the fourth area, we will generally conclude that your impairment is not severe, unless the evidence otherwise indicates that there's more than a minimal limitation in your ability to do basic work activities. Kennedy. Counsel, I think you have a good argument on the medical part. My concern is more with the finding that was made that he exaggerates. Let's see if you could focus on that for a moment. There is some discussion about him living off his girlfriend's disability check for 13 years, but I found absolutely nothing in the record about that. Maybe it's in there, but I was unable to find it. And I'm not overly impressed that in the year 2000 that he told his doctor he'd like to be on disability. Most people who were hurt would like to be on disability. What concerns me is whether the ALJ doubted the ALJ's position that he doubted McCulloch based upon inconsistent statements. That's the part that bothers me. Now, could you focus on that? And my concern is whether he stopped too short at step two, and he should have continued on, and we'd have to send it back for a continuation of the hearing. Why is it that these statements that we can say under our law, the test of what we have to do on credibility, that there are inconsistencies that allows the ALJ to reject the statements of McCulloch? Yes. One of the complaints that Mr. McCulloch had was that he had daily diarrhea. And he said that that was one of the reasons that he had to stay close to home and close to the bathroom, because he had diarrhea. There's no evidence. There's no objective evidence that supports this allegation. And did he have reticulitis? Well, Your Honor, if I could just finish here, because the record actually shows that in 1998, he weighed 181 pounds. In November 2000, he weighed 175. In May of 2000, he weighed 192. And then he testified at the hearing that two months prior, he weighed 214 pounds. So he was steadily gaining weight over this period that he said he had diarrhea. So one would logically conclude that if someone had diarrhea, that you're going to be losing weight, and the man is gaining weight. The — well, further, he talked about this mild — mild chronic obstructive pulmonary disease. He smoked two to five packs of cigarettes a day, plus marijuana laced with opium. He certainly wasn't following the doctor's advice to stop smoking to improve his — his — his pulmonary problems. His activities were — well, let me go to the inconsistent statements. The inconsistent statements — he testified to a traumatic event. He said he saw his father choking his mother, and then he reacted, and he shot his father with a shotgun five times. And he said that he told this to Dr. Carroll, the C.E. But the story's not in the family history. Dr. Carroll did include other family history, but he didn't — Well, I understand there's — there's some problems in his testimony. You point out one, and then he has the problem that he can't breathe, that he involves in smoking, and says he can't get along with people, but he does odd jobs for the neighbors. I understand those inconsistencies. But what I think that you need to argue is, is whether this demonstrates the clear and convincing evidence that we require in order to tip over the claimant's credibility. How would you argue that this is clear and convincing evidence of incredibility? Well, Your Honor, again, in the medical records, there's a record in May 2003. He went to the doctor because he was hit in the kneecap with a leveling rod. He told the caregiver there that he was at work when he was hit in the kneecap. And he also said that he went on and worked for the rest of the day and didn't seek out medical help until the end of the day. So he's talking about working, that he was at work when he got hit with this metal leveling rod. And then at the hearing, when the ALJ asked him about this, you know, well, wait a minute, you were at work when you were hit with this leveling rod. And he says, oh, no, no, no, I was just helping a friend unload some wood. You know, we were just unloading wood, and he hit me in the knee. And it's the ALJ, it's the ALJ makes a credibility finding, and he didn't believe him. He didn't believe that that was the story, since he had told the person at the hospital that he'd been hit in the kneecap with a 20-foot leveling rod, and he continued to work through the rest of the day, even though it hurt. And then he says, oh, no, no, no, I wasn't working, I was just unloading wood. You know, that's just another example. Another example is the ALJ noted that he said he never worked at all. He said, did you work after your alleged on-sent date? And he said, no, no, no, I didn't work at all. But his earnings record showed earnings in 2002 of $752.68. Okay, that's not very much money. But when he asked him, what was this about, and he said, oh, no, I didn't work. That must have been just some tools that I sold to a friend of mine. Well, the ALJ correctly pointed out that selling tools to somebody is not going to show up on your earnings record. This is on an earnings record that came in. So there were lots of inconsistencies, not to mention the inconsistencies in Mr. McCullough's complaints, and no objective findings to document any of these. He says that his mental impairments affect his ability to work. But he spends his days, and indeed, he says 20 hours a day. That's in the record at 3.30. He spends 20 hours a day studying, reading and studying encyclopedias and dictionaries and things that catch his interest. He said he's doing a lot of studying, studying electrical design, electrical engineering, brick and stone work, and stone cutting. This man has a mind that works. It's a good mind. He can put it to use. He can work. I see that I'm out of time, Your Honors. If anyone has questions. Thank you. I would ask that the Court affirm the Commissioner's decision. Your Honor, I would like to say that inconsistencies, by their nature, are part and parcel of somatization. As we see just above, on Record 21, the huge paragraph in the middle of the page is the Administrative Law Judge's discussion of some of the inconsistencies that concerned him. Just above that, as Judge Pius indicated a little bit earlier when I was speaking, a couple of paragraphs before that, where the Administrative Law Judge was reflecting some concern whether there is somatization disorder at work here. Inconsistency is part and parcel of that. So I believe that, as I said earlier, that the special severity criterion was met here and that there is sufficient information here in the record that the judge should have proceeded past Step 2. We may well have had a case here, had he properly developed this, in which he would have had an appropriate medical authority to try to look more closely and specifically at whether somatization disorder should have been considered here as well. That might have provided Judge Wallace a better answer or explanation to some of the matters that concern you about the inconsistencies. I can't explain all of those. It is clear that my client has a record of exaggeration, magnification. Those are inconsistent types of behavior in terms of what he communicates to others. Thank you. I don't think I was. You know, I mentioned when you were last up that there was a prior proceeding in this case. No, there was not. No, there's just the one hearing. Okay. With Judge Ed. With Judge Ed. Oh, I'm sorry. There was. And the administrative counsel found the appeals counsel found some inconsistencies and errors and sent it back. Yes. But not, I mean, it got, the first time it got beyond step two. It did. That's right. It got all the way to step, it got all the way to step four and five. All the way to step five with Judge Batiste. I recall it now with Judge Batiste, and because I also talked about that in my briefing as well, that it reached past that, and Judge Batiste breezed past step two and found a number of different severe impairments. And he proceeded on to step five. And I realize that the last decision is the one we reviewed, but it was kind of, a little bit odd that, you know. It's quite a contrast in the two decisions that Judge Batiste would have lingered not at all at step two and breezed on to more substantive. Thank you. Thank you. Matter submitted. They are...
judges: Wallace, Noonan, Paez